UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASE NO.: 23-497-002 (VEC)

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

STEPHEN FORLANO,

      Defendant.

_____/

## SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF STEPHEN FORLANO

Bachner & Associates, PC
111 Broadway, Suite 111
New York, New York 10006
(212) 344-7778
*Attorneys for Stephen Forlano*

1

## **PRELIMINARY STATEMENT**

This sentencing memorandum is respectfully submitted on behalf of Defendant Stephen Forlano ("Mr. Forlano" or "Stephen") as an aid to this Court in what is arguably the most important and difficult function a judge must perform—the imposition of a just sentence on a fellow human being who has broken the law.

Stephen Forlano, age 27,  stands before this Court to receive his sentence having pleaded guilty to one count of insider trading as part of a plea agreement with the government. In fashioning his sentence, Mr. Forlano respectfully requests that the Court consider the following key points:

First, all parties, including the Probation Department agree that Mr. Forlano's offense level is 13 (12-18 months) under the U.S. Sentencing Guidelines, which places him in Zone C of the Sentencing Table under U.S.S.G. § 5A.[1] Pursuant to the 2023 Sentencing Guidelines Amendments, because Stephen is a "Zero- Point Offender" in Zone C, there is a "general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first time offender who has not been convicted of a crime of violence or an otherwise serious offense." Commentary to U.S.S.G. § 5C1.1. As discussed later, Mr. Forlano's conduct meets these criteria.

Second, according to a psychological assessment completed by Celena A. Heine, PhD, LMHC, Stephen is a diagnosed gambling addict. His addiction was eschewed by him and by his friends, who never really appreciated the seriousness of his condition. Since his arrest, with the support of his loved ones, Stephen has been getting the treatment he so desperately needs. To be clear, Stephen understands that the decision to break the law was his, and he unequivocally accepts that responsibility. His gambling addiction, however, still played a direct role in making his bad decisions.

---

[1] The Presentence Report ("PSR") has recommended a sentencing variance to 6 months. (PSR at p.29)

Third, as a result of his arrest and conviction, Stephen, who has a stable work history, was required to resign his position as a $60,000.00 a year analyst for Progress Residential, a privately held single family residential real estate firm. (PSR ¶¶ 86-87). He is now employed as a delivery person for DoorDash. (PSR ¶¶ 84-85). A non-prison sentence will allow Stephen to reintegrate into society more quickly while still punishing him for his crime.

Fourth, is the utter embarrassment and public humiliation Stephen has caused his family. Up until his arrest in this case he was considered by his friends and community members to be an honest young man who was always there to help those in need. Although Stephen has no one to blame but himself for his horrible predicament, the fact remains that his arrest in this case has had a profound impact on him and on his family's reputation and has punished him in an extraordinary manner not generally seen in white collar criminal cases. As discussed later, the national attention alone serves as a specific and general deterrent.[2]

Fifth, Stephen's father is suffering from advanced Parkinson's Disease which will require prompt and uncertain surgeries. As discussed, *infra,* although their love runs deep, Stephen and his dad have had and continue to have a complicated relationship. Since he was barely a teenager, Stephen never felt that he measured up to his father's expectations and was continuously trying to prove his worth. Since being notified of the insider trading investigation, Stephen has not slept a full night

---

[2] For example, https://www.justice.gov/usao-sdny/pr/former-employee-two-leading-global-financial-institutions-and-his-associate-plead; https://www.sec.gov/litigation/litreleases/lr-25861; https://www.investmentexecutive.com/news/from-the-regulators/wall-street-analyst-pleads-guilty-to-insider-trading/; https://nypost.com/2023/10/03/ex-goldman-analyst-anthony-viggiano-indicted-for-insider-trading-won-ethics-prize/; https://www.bloomberg.com/news/articles/2024-01-10/ex-goldman-associate-will-plead-guilty-in-insider-trading-case; https://www.law360.com/articles/1784173/ex-goldman-analyst-to-plead-guilty-in-insider-trading-case; https://nypost.com/2023/09/28/ex-goldman-sachs-worker-hit-with-insider-trading/; https://fortune.com/2023/09/28/goldman-sachs-ex-employee-tipped-friends-federal-prosecutors-insider-trading-case/; https://www.reuters.com/legal/former-goldman-blackstone-analyst-charged-with-insider-trading-2023-09-28/; https://www.techspot.com/news/100351-fbi-indicts-three-insider-trading-scheme-utilized-xbox.html; https://www.ft.com/content/98e632de-410b-4dae-9330-975f35dde959.

knowing that his own behavior, including tipping his father and uncle, has impaired his father's health.

Finally, Stephen is utterly remorseful and ashamed of his actions. He fully recognizes the gravity of his crime; the negative impact insider trading can have on the public's perception of the fairness of the market; and the resulting unfair advantage he profited from. He takes full responsibility for his actions and pleaded guilty for his crime.

Up until this point, Your Honor has understandably had a limited perspective of who Stephen Forlano is. This memorandum presents to Your Honor a more expansive understanding of him as a person. It is noteworthy that despite his crime and the pain and disappointment it has caused, Stephen is still loved by those who know him best for his kindness, honesty, and compassion. We have attached to this memorandum letters of support from a variety of people, including Stephen's parents; his long-time friends; Church members; charities; and his psychologist; each describing their reasons for asking Your Honor to temper cold justice with warm mercy when imposing judgment on this young man.

## I.  **PSR OBJECTIONS**

The defense joins in the corrections to the PSR contained in the Government's Sentencing Memorandum. (Govt. Sent Memo, pp.3-4)

## II.  **LEGAL STANDARD**

It is a basic tenet in sentencing that every defendant must be judged on the totality of his being and not solely on the crime he committed. Critical to the sentencing decision is the parsimony clause - the overarching principle behind 18 U.S.C. § 3553(a) - which requires that a sentencing court "*shall impose a sentence sufficient but not greater than necessary*" to meet the

goals of sentencing.[3] (emphasis added)  "In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized." *United States v. Sloane*, 308 F.R.D. 85, 87 (E.D.N.Y. 2015). "Fortunately, thanks to the Supreme Court, district courts are now allowed to impose a sentence that varies from the Guidelines based solely on disagreements with the Guidelines, as long as they state the basis for their disagreement along with sufficient justifications for the extent of any departure." *United States v. Parris*, 573 F. Supp. 2d 744, 754–55 (E.D.N.Y. 2008)  (internal citation and quotation marks omitted).

Pursuant to the Presentence Investigation Report ("PSR"), Mr. Forlano's Offense Level is 13, placing him within Zone C of the Sentencing Table under U.S.S.G. § 5A.  Although the advisory Sentencing Guidelines range is 12 to 18 months of imprisonment, because Stephen is a "Zero-Point Offender" in Zone C, a sentence of probation with conditions of confinement is appropriate since the crime is non-violent and we urge, not a "serious offense." U.S.S.G. § 5C1.1, n.10). Moreover, the § 3553(a) factors weigh heavily in favor of a non-prison sentence to allow Stephen to begin the process of rebuilding his life while receiving needed therapy and remaining close to his extremely ill father. Such a sentence considers the reputational and financial punishment Stephen (and his family) experienced to date, the need to deter others, the types of sentences imposed on similarly situated first-time offenders, and that it is "sufficient but not greater than necessary" to effectuate the purposes of

---

[3] The parsimony clause was originally part of the House sentencing reform bill and was later added to the Senate resolution and adopted in committee. The clause was "not just another 'factor' to be considered along with others in § 3553(a) – it sets an independent limit on the sentence a court may impose. David L. McColgan & Brett G. Sweitzer, *Grid & Bear It, 29 Champion 50, 50 (2005); see also* Richard S. Frase, *Punishment Purposes,* 58 Stan. L. Rev. 67, 83 (2005) (stating that the "structure of section 3553(a)," which lists the parsimony clause first, suggests strongly that this principle "sets overall limits on the crime-control and other purposes which follow.")

sentencing set forth in 18 U.S.C. § 3553(a).

### A. The Factors Set Forth In 18 U.S.C. § 3553(a) <u>Strongly Support A Non-Custodial Sentence</u>.

Subparagraph 2 of Section 3553(a) directs that in addition to the advisory non-binding sentencing guidelines, "[t]he court, in determining the particular sentence to be imposed, shall consider" the following factors relevant to this case:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—

(A) to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with . . . medical care . . . in the most effective manner;

(3)     the kinds of sentences available; and …

(6)    the need to avoid unwarranted sentence disparities among
         defendants with similar records who have been found guilty of similar conduct; … and

(7)     the need to provide restitution to any victims of the offense.

The factors enumerated in Section 3553(a) are the "bedrock of all federal sentencing". *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). In crafting the proper sentence, the "district judge should . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party". In so doing, the judge "must make an individualized assessment based on the facts presented." *United States v. Davalos*, 2008 WL 4642109, at *1 (S.D.N.Y. Oct. 20, 2008) (quoting *Gall v. United States*, 552 U.S. 38, 40 (2007). "A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not." *United States v. Ramirez*,

2009 WL 4722237, at *2 (S.D.N.Y. Dec. 4, 2009).

Below we discuss *seriatim* the 3553(a) factors as they apply to Mr. Forlano's upcoming sentencing.

### B. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

**The Charge and Guilty Plea**

On January 11, 2024, Stephen Forlano pleaded guilty before Your Honor to Count Five of the Indictment charging that between November 28 and December 14, 2022, he purchased 44 call options on Maxar stock based upon material nonpublic information he received from Anthony Viggiano. Mr. Forlano, then aged 24, knew that Mr. Viggiano obtained the inside information in strict confidence by virtue of his position at an investment company and investment firm. Mr. Forlano's gain for guidelines purposes, both personal and foreseeable as to others he tipped, totals $225,083.00. Pursuant to the terms of his plea agreement, Mr. Forlano's guideline's level is 13 with a suggested prison sentence of 12-18 months.

**The Relevant Facts**

In 2016, in his sophomore year at the University of Tampa, Stephen Forlano joined the business fraternity. Anthony Viggiano was the President of that fraternity. Stephen and Anthony became roommates and close friends. In 2018, Anthony graduated and moved back to Long Island, New York, while Stephen remained in Florida. Their friendship remained strong and they spoke and visited each other often. Stephen and Anthony considered each other to be more like brothers than friends.

From April to October of 2021, Viggiano was employed at an investment company as an analyst. From February 2022 until July 2023, he was employed as an analyst and then an associate in the asset wealth management division of an investment bank. During Viggiano's employment at

the two companies he was made privy to material non-public information ("MNPI") pertaining to several companies.[4] Viggiano then provided the MNPI to Stephen who invested in several of the companies realizing gains of $61,457.00 on ECOM; $50,603.00 on MAXR; and $1,528.00 on HRMY, for a total profit of about $113,588.00.

Stephen also tipped his father, his uncle and a close college friend, Nathan Bleckley, a captain in the US Army. Bleckley was told that the tips were based on MNPI. Stephen's dad and uncle were not. As a result of Stephen's tips, Bleckley profited $1,735.00 in HARMY and $23,003.00 in ECOM. Stephen's father made $227.00 on HARMY and $67,146.00 on MAXR. Stephen's uncle made $8,209.00 on MAXR.

## C. STEPHEN FORLANO'S HISTORY AND CHARACTERISTICS

It is no accident that the first criterion under § 3553(a) – The Nature and Circumstances of the Offense *and* The History and Characteristics of the Defendant - was drafted by Congress in the conjunctive. In imposing a fair sentence, justice dictates that the crime committed by a defendant should not be viewed separately in a vacuum but instead in light of the defendant's unique humanity. It has long been recognized that a defendant's character is always "a central consideration in the fashioning of a just sentence." *United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir. 1993). The U.S. Supreme Court has voiced a similar opinion```. *See Gall v. United States*, 552 U.S. 38, 52, 128 S. Ct. 586, 598 (2007) ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

---

[4] The companies included IG ("AIG"); Harmony Biosciences Holdings Inc., (HRMY"); CDK Global Inc., ("CDK"); Computer Services, Inc. ("CVSI"); ChannelAdvisor Corporation ("ECOM"); MAXR Technologies ("MAXR"); Atlas Technical Consultants, Inc. ("ATCX"); and Syneos Health, Inc. ("SYNH").

punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113, (1996)); *see also* 18 U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited regarding the information about a defendant's background, character, and conduct that it may consider for the purpose of imposing an appropriate sentence).

As attested to in the letters attached to this memorandum, Stephen Forlano's personal history and circumstances show that despite his misconduct here, he is an intelligent, caring, charitable and compassionate young man. But that is only part of Stephen's mosaic. Unfortunately, like his father and grandfather, Stephen is also a gambling addict who suffers from related emotional illnesses including depression and PTSD which impacted his illegal behavior. While Stephen understands that he is responsible for the crime he committed and must be held accountable for it, we urge that his aberrational conduct should not define him at this most crucial time. As the oft cited and respected jurist, the Honorable Jed S. Rakoff, so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

### a. Stephen Forlano's Background.

Stephen Anthony Forlano was born in Freehold, New Jersey on August 24, 1996. Stephen's father, Stephen Forlano Sr., is a 63 year-old retired dentist. His mother, Denise, is a 56 years old dental hygienist who worked in her husband's office. They reside in New Jersey. *See id.* ¶ 70. Stephen has an older sister, Jaclene, age 30, who is a speech pathologist in Boston. PSR ¶¶ 69-70. Stephen's

dad suffers from late stage Parkinson's Disease which has been severely debilitating.[5]  His condition

has deteriorated significantly since being notified of the SEC and DOJ investigation well-over a year

ago, which culminated in his son's arrest.[6]

**b.  While Stephen Was Raised by Loving and Caring Parents**
**His Relationship With His Father Was Complicated**
**By His Father's Need for Stephen to Always Succeed**

  Stephen was brought up in a religious Christian home. His parents showed him true love but

also demanded from him more than he could produce. In Stephen's psychological assessment report

completed by Dr. Celena Heine, Stephen reported that although he did not consider himself to be

abused at home during his formative years, he was "'yelled at a lot" and lived "in fear all the time

that my performance wasn't good enough." Stephen described his father as a "'strict disciplinarian

with anger issues and a short fuse," who, like his son, had a gambling disorder (now in remission).

Stephen's "father's high expectations just became his own expectations for himself." For example,

because Stephen's father loved and played baseball in college, Stephen was expected to do the same.

Stephen reported to Dr. Heine that "'[I]t was a good thing I ended up loving it because if I hadn't, it

would have been a problem.'" Stephen practiced relentlessly at baseball and hockey trying to "'prove

myself to my dad.'"  (Ex. A, p.3)  In Stephen's letter to this Court, he recalls that

---

[5]  Dr. Forlano is scheduled to undergo Deep Brain Stimulation (DBS) surgery on April 26, 2024, May 17, 2024, and May 23, 2024. DBS is a surgical therapy used to treat certain aspects of Parkinson's Disease but can only help relieve symptoms, not cure, or stop the disease's progression. https://www.parkinson.org/living-with-parkinsons/treatment/surgical-treatment-options/deep-brain-stimulation; https://www.youtube.com/watch?v=eRfxYjZvxYQ.

[6] Defense counsel requested to allow Stephen to surrender since it was clear he was not a risk of flight or dangerous to the community. The request was taken under consideration and without notice, rejected. The decision not to allow voluntarily surrender is generally left up to the discretion of the FBI and has been criticized as serving no legitimate purpose in routine white collar cases other than to generate publicity and humiliate the defendant. *See,* https://www.abajournal.com/web/article/perp-walk-white-collar-arrests. https://www.nytimes.com/2018/12/02/us/perp-walk.htm.

[f]rom the time I was old enough to grip a baseball bat my father was always present throwing me batting practice. He played for Fordham University during his playing career, and very much lived vicariously through my playing days. No matter how well I would do on the baseball diamond it always seemed like he would find something to chastise about my play. This was all done out of love of course, he just wanted me to be the best player I could. Unintentionally, this put an enormous amount of pressure on me to produce exceptional results not just in baseball but in all facets of my life. (Exhibit B)

Stephen's need to succeed met reality when he attended Christian Brothers Academy, an elite all boy's high school known for its outstanding sports program. Stephen made the hockey and baseball varsity teams but "never played." Stephen was let go from both programs and told "'we don't need you anymore.'" Rather than accept that he was not as talented as some of the other players, it became a '"major source of anger" and caused Stephen to lose "faith in people." He felt deceived from '"all the work down the drain for nothing.'" Now, in hindsight, he believes, among other things, that he simply "'had too much pride.'" (Exhibit A, pp.3-4)[7] Although academically Stephen was an excellent student in high school and graduated cum laude from college, all he could see were his failures and his need to be "perfect" – to satisfy what he believed his father expected of him.

Stephen Forlano, Sr., recalls that "[t]eaching, instructing and talking with my son, Stephen developed a disposition of a "pleaser" always trying to please his Dad who he loved, looked up to and admired. . . . With the surfacing of this recent issue now in the forefront, Stephen has asked me for forgiveness, apologized incessantly, and has stated I am a failure in your eyes, I'm not worthy in the face of God, I will accept whatever I have coming to me." (Exhibit C)

c.  **Stephen's Pathological Gambling Addiction**

---

[7] In Stephen's sophomore year of college, his first serious romantic relation which began in high school ended. Stephen reported to Dr. Heine that as a result of the break-up he felt like an even greater failure and experienced deeper bouts of depression. (Exhibit A, p.4)

While proof of a defendant's motive is not required to convict him of a crime, it is, however, an indispensable consideration for arriving at a fair and just sentence. Why would Stephen Forlano, an otherwise law-abiding, religious, and compassionate young man, break the law? It was not just greed or hubris. Stephen is a pathological gambler whose control impulses were affected by his disease. To try to put Stephen's behavior into context we begin with a discussion of pathological gambling.

### d.      Pathological Gambling Is A Recognized Behavioral Addiction

For many centuries, gambling was often dismissed as a moral failing. Thousands of years ago, the Talmud, for example, prohibited a gambler from acting as witness in court since he was involved in a trade that served no societal interest and might therefore not be scrupulous and truthful about other people's financial rights. Sanhedrin Tractate 24B. More recently, George Washington cautioned to "avoid Gaming—This is a vice which is productive of every possible evil. equally injurious to the Morals & health of its votaries—It is the child of Avarice—the brother of inequity— & father of Mischief—It has been the Ruin of many worthy familys—the loss of many a mans honor—& the cause of Suicide." George Washington to Bushrod Washington, 15 January 1783.https://www.mountvernon.org/library/digitalhistory/past-projects/quotes/article/avoid-gamingthis-is-a-vice-which-is-productive-of-every-possible-evil-equally-injurious-to-the-morals-health-of-its-votariesit-is-the-child-of-avaricethe-brother-of-inequity-father-of-mischiefit-has-been-the-ruin-of-many-worthy-familysthe-loss-of-many-a-m/ Early psychiatry, particularly among the Freudian followers, believed that compulsive gamblers actually craved punishment, since losing was guaranteed by the game's unfavorable odds. See E. Bergler, The Psychology of Gambling (1954). Finally, in 1980, the American Psychiatric Association ("APA") recognized pathological gambling as an "impulse control disorder." See APA Diagnostic and Statistical Manual of Mental Disorders

324 (3d ed. 1980)("DSM-III"). In 2013, the APA reclassified compulsive gambling as an addiction-related disorder, based on the growing body of research that pathological gambling and substance addiction had similar effects on the same region of the brain. See DSM-5 at 585 (5th ed. 2013)[8]. See also C. Holden, Behavior Addictions Debut in Proposed DSM-V, SCIENCE, February 2010 at 935 (Brain imaging and neurochemical tests have made a "pretty strong case that [gambling] activates the reward system in much the same way that a drug does."); see generally Nat. Ctr. for Responsible Gaming, Gambling, and the Brain: Why Neuroscience Research is Vital to Gambling Research (2011).

The DSM-5 defines gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." Among its characteristics are: (i) preoccupation with gambling; (ii) chasing one's losses (gambling more money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide money to relieve desperate financial situations caused by gambling. Id. See also Ex. A, pp.6-8.

Gambling patterns "may be regular or episodic and gambling disorder can be persistent or in remission," but it is typically a progressive disease. Id. at 587. Gambling disorder generally includes several stages. In the first stage, known as progression, the gambler is unable to control or stop gambling. He is compelled to spend more time and money gambling trying to achieve the same level of excitement. In the second phase, known as intolerance, the gambler begins to conceal the amount and frequency of his losses, and has uncontrollable urges to gamble to win back what he lost. The third stage, known as preoccupation, is characterized by obsessive thoughts of gambling and the

_____

[8] Gambling addiction is currently the only behavioral addiction that the DSM-5 recognizes. https://my.clevelandclinic.org/health/diseases/17881-gambling-disorder-gambling-addiction.

belief that it is a panacea. In the final stage, known as the disregard for consequences, the gambler is convinced that a "big win" will solve his problems, and disregards the negative consequences of his gambling, often engaging in illegal activities such as forgery, theft, and embezzlement. See Darren Gowen & Jerri B. Speyerer, Compulsive Gambling and the Criminal Offender: A Treatment and Supervision Approach, 59 Fed. Prob. 36, 36-37 (Sept. 1995).

Prior to November 1, 2003, several courts found that "a pathological gambling disorder, if proven . . . to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, [could] qualify . . . as a form of 'diminished capacity' under §5K2.13," and warrant a downward departure. *United States v. Harris*, 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994)(collecting cases). *Accord, United States v. Liu,* 267 F. Supp. 2d 371, 375 (E.D.N.Y. 2003)(granting a downward departure, "leading to imposition of the minimum sentence permitted," based on defendant's pathological gambling addiction, which "interfered with [his] ability to control behavior that he knew was wrongful"); *United States v. Checoura*, 176 F. Supp. 2d 310, 314 (D. N.J. 2001)(granting downward departure to compulsive gambler and noting that the defendant "did not choose to gamble compulsively, any more than other compulsives choose . . . to wash their hands after touching every doorknob").

In late 2003, the Sentencing Commission issued a policy statement eliminating  addiction to gambling as a basis for a downward departure. U.S.S.G. §5H1.4, apparently in response to Congress' direction under the PROTECT Act to "to ensure that the incidence of downward departures [was] substantially reduced." Appendix C, amendment 651. The Congressional direction was widely criticized for "shuck[ing] the wisdom . . . and breadth of experience accumulated by judges" in fashioning individualized sentences. *United States v. Mellert,* 2003 WL 22025007, at *2 (N.D. Cal. July 30, 2003).

After the Supreme Court decision in *Booker*, §5H1.4's policy statement is not binding on a sentencing judge. See *United States v. Jones,* 460 F.3d 191, 194 (2d Cir. 2006) ("the Guidelines limitations on the use of factors to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves"). Section 5H1.4 has been roundly criticized as especially unworthy of deference because it was not the product of expert consideration. See *Kimbrough v. United States*, 552 U.S. 85, 109 (2007)(where the Commission "did not take account of 'empirical data and national experience,'" the Guidelines should command little respect).

Post-Booker, courts have conferred variances based on compulsive gambling. See for example, *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014) (sentencing a defendant who stole over $ 1,000,000 from her employer to fund her gambling addiction to fifteen months in prison below her Guidelines range of forty-one to fifty-one months in part because her gambling addiction mitigated her personal culpability for the fraud); *United Sattes v. Casperson,* 16 Cr. 414 (JSR) (Court sentenced a securities fraud defendant who stole almost $28 million from his friends/clients to 48 months in prison, well below his range of 151-188 months, because the defendant's gambling disorder "very seriously impacted his exercise of rational control and rational decision making, [and] there is also the fact that no purpose will be served by letting him rot in prison for years on end. It will serve no purpose that the Court can justify." Sentencing Transcript p. 80 (Exhibit D)

Surely then, a variance for compulsive gambling is appropriate and "consonant with the compassion and humanitarianism which must always characterize the American system of justice." L. Lustberg, Sentencing the Sick: Compulsive Gambling, 2 Seton Hall J. Sport L. 51, 76 (1992).[9]

---

[9] Notably, the 6 month prison recommendation (and variance) contained in the PSR was made without any consideration of Stephen's gambling addiction because of the erroneous belief that a variance was not legally permitted. ("The basis (the addiction or disorder) for such criminal conduct cannot be used as a factor for a

### e.  Mr. Forlano's Psychological Assessment Report
###    Concludes that He is a Pathological Gambler.

Dr. Celena Heine was retained to prepare a Psychological Assessment Report of Stephen Forlano pertaining to his gambling and the effect it may have had on his judgment when he engaged in the instant offense of insider trading. The purpose of the evaluation was not to excuse or explain away his illegal conduct, which he admits he intentionally committed, but rather to provide Your Honor with a more complete picture of this young man's psychological state to aid the Court in arriving at a fair and just sentence.

Dr. Heine's Assessment Report concluded "Mr. Forlano meets all [ten] criteria [in the DSM-5] for pathological gambling diagnosis." (Exhibit A, pp. 8; 23) It is highly significant that he also scored 9 out of 10 on the NORC Diagnostic Screen for Gambling Problems and thus met the criteria for pathological gambling. Id. p.18.  Notably, Dr. Heine also concluded that "Mr. Forlano appears to be struggling with all aspects of impulsivity . . . with his total impulsivity score of 136 placing him in the 87th percentile. . . ." Id. p. 21. Dr. Heine also conducted related psychological evaluations and found that Stephen met the criteria for Generalized Anxiety Disorder; persistent depressive disorder (Dysthymia) with persistent major depressive episode; PTSD; and Personality Disorder-Trait Specified. Id. 12-18.

In Dr. Heine's diagnosis she concluded:

In my expert opinion, Mr. Forlano meets the criteria for a gambling disorder (called pathological gambling in DSM-5). By diagnostic assessment and based on the magnitude of his gambling-related financial, interpersonal and legal problems, his gambling disorder is best characterized as being severe.

With respect to Mr. Forlano's illegal behaviors, they have been limited to the time when he was actively gambling on the stock market while experiencing an active

---

departure or a variance.") PSR p. 30. Had Mr. Forlano's addiction been considered, the PSR's variance recommendation may have been greater.

gambling disorder. It is not uncommon for people with a gambling disorder to commit illegal behaviors in order to support their active gambling. During these times, when in the midst of an active addiction, people often demonstrate poor judgment and a diminished capacity to exert control over their impulses and behavior. Following recovery and when not actively gambling, they usually exhibit better judgment and greater self-control.

As such, I conclude that Mr. Forlano was functioning under a diminished mental capacity related to his gambling disorder when he engaged in the illegal conduct for which he has been prosecuted. In my professional opinion, this diminished capacity related to his gambling disorder was the principal reason he engaged in these unlawful activities, as it left him with significant impairments in controlling his behavior that he otherwise knew was wrongful. Given that he is now in recovery, he should show significantly improved decision-making and impulse control, as he did prior to his gambling disorder. In other words, he is highly unlikely to reoffend. Id. pp. 27-28.

**f.   Stephen's Gambling Addiction**
    <u>**Included Investing in the Stock Market**</u>

For individuals like Stephen Forlano who suffer from gambling addiction, investing in the stock market legitimizes their compulsion. One author writes that:

At a basic level, gambling and investing are identical activities of wagering on an outcome in an environment of uncertainty. In addition, both risk-taking activities have been present in the American culture for all of its history. At some point over 100 years ago, public attitudes of the two types of speculation diverged, with investing being labeled as socially desirable and therefore supported by law, and gambling being labeled as socially undesirable and therefore prohibited by law. This divergence was based not on any logical differences in the activities, but instead on the classes of people that participated in these activities and who profited from them. Stockbrokers, stock exchanges, and their wealthy clients benefited from this legal distinction; working class gamblers and bookmakers did not."

Christine Hurt,  "Regulating public morals and private markets: online securities trading, internet gambling, and the speculation paradox" *BOSTON UNIVERSITY LAW REVIEW* [Vol. 86:371, 376] (2006) (https://www.bu.edu/law/journals-archive/bulr/volume86n2/documents/HURTv4.pdf.) "Any attempt to substantively distinguish all types of gambling (from slot machines to poker to sports betting) from all types of investing (from long-term ownership to day trading to purchasing derivatives) is illusory." Id. at 377. It is no wonder that recently there has been a significant uptick

by retail investors and day traders seeking treatment for compulsive gambling. https://markets.businessinsider.com/news/stocks/stock-market-retail-investors-trading-addiction-wallstreetbets-gambling-rehab-2022-9.

Stephen Forlano began his foray into the stock market in the 8th grade when he begged his father to open up a custodial account on his behalf to begin his investing journey. (Exhibit B) By the time he was 15 or 16 years old, Stephen was wagering on sporting events and investing in individual stocks. His risk seeking behavior grew and by the time he graduated college, he had incurred substantial debt, often borrowing money from his father to pay it off. In his letter to Your Honor, Stephen writes:

> From the time I was in high school I was drawn to wagering on sporting events and individual company stocks. Gambling addiction has a history in my family. Things started primitively, with only small amounts of money being risked. As my emotional issues began to escalate during my senior year of high school and college years, the size of my bets in stocks and sports increased proportionally. This persisted into my career in finance after college. I would often waste my hard earned paychecks on my addiction with little regard to saving any funds for the long run. Eventually I started taking out personal loans to fund my brokerage account in an attempt to earn back losses accrued not always exclusive to the market. . . . (Exhibit B)

In his psychological assessment interview, Stephen told Dr. Celena A. Heine that in college "'he went big into stocks'" and "felt he 'had some magical formula and was just better than other people' and demanded he become the best; 'it quickly became a way I needed to get rich.'" Stephen then began taking out large personal loans, some as high as $30,000.00. (Exhibit A at p.5). It was at this point that his former college roommate, Anthony Viggiano, a CPA working for an investment firm, suggested that they could make money engaging in insider trading. Stephen believed that insider trading was the means to

extricate himself from his debt obligations and prove to himself and to his father that he was

not a failure and could succeed. Stephen explains:

> Due to my burgeoning addiction to gambling in several forms, I became increasingly reckless with my trading strategies and indebted as a result. Just as I failed in my previous athletic endeavors, I had failed in my quest to become an independent trader. It was a crushing blow to my personal pride, that was until my best friend Anthony Viggiano approached me with material non-public information related to mergers and acquisitions that his employers had been working on. I was extremely surprised that he would divulge pertinent details of these deals to me as I always knew Anthony as a man of upstanding morals, character, and intelligence. However, I was desperate to climb out of the financial hole I had dug myself into and restore my pride in my own eyes by any means necessary. I could not have been more incorrect in this extremely perverse line of thinking. Using this intel to my financial advantage was absolutely wrong and harmful to the integrity of the market. (Exhibit B)

As Stephen's gambling became more reckless, many of Stephen's college friends noticed the change

in his personality. Others failed to appreciate the addiction particularly because Stephen vigorously

denied his problem to them. Stephen's sister, Jaceline Forlano recalls her experience with Stephen:

> I feel that he [Stephen] experienced many trials and traumas in his young adult life that ultimately led to his vulnerability to the poor decisions that he has made. I believe the most destructive of these has been the onset of a gambling addiction. Over the last number of years, I have personally watched his "casual, fun" fantasy sports leagues turn into something much, much more. I watched as he became completely attached to his cell phone and computer, incessantly checking stock prices and scores of sporting events. I watched as he lost interest in his favorite pastimes, and couldn't be drawn away from the events he was counting on for more than a few minutes. I watched as his moods changed drastically at the drop of a hat. I watched as the person I once knew began to fade into the distance. When I would try to speak with him to offer support or guidance, Stephen was fiercely independent and concealed his struggles. He never wanted to burden others with any problems, always insisting he was okay. I believe all of this to be the result of his gambling addiction and desperate need to recover from losses, whether they be sporting bets or stock investments. (Exhibit E)

Stephen's mother, Denise Forlano, recalls that because he lived in Florida, her periodic visits made it very difficult to gauge Stephen's well-being. Two years ago, my husband and I sensed something wasn't quite right. Expressing our love for him, pleading with him to confide in us, his only response was "everything is fine!" "I have a lot on my plate currently, given more responsibilities at work." However, we felt there was more to it than that.

His behavior continued to be noticeably erratic when he was home visiting in NJ. His

obsession with his cell phone, accompanied by roller coaster mood swings, developed into a nervous twitch. When questioned, his defensive answer was "everything is fine!"

In late June, served with a subpoena, he finally admitted his stock market, casino and sports wagering gambling disorder and the poor decisions it had caused him to make, including credit card debt and borrowing money from family and friends.

The immense remorse and regret was expressed by Stephen immediately and repetitively. He said "I didn't know what to do, I was desperate and I didn't want to burden you, you have enough to handle with daddy's Parkinson's Disease." "I made some terribly wrong decisions," he continued to apologize endlessly. "I'm a terrible son, you shouldn't love or forgive me." "I always just wanted to make you proud of me." "I'm such a failure." (Exhibit F)

Chimaechi Ekekeugbor is now a full-time basketball coach and trainer. Mr. Ekekeugbor was classmates with Stephen for four years at Christian Brothers Academy and remained close friends with him after they graduated, visiting each other's homes and family. In his letter to the Court, Mr. Ekekeugbor describes Stephen as "always hard-working, ambitious, and a perfectionist at everything he did." He also recounts that Stephen's addiction impacted his otherwise good judgment:

> Unfortunately, once Stephen went to college and playing sports was in the rearview direction of his life, his passion for sports was replaced with a passion for making money. Honestly, I never thought this was where Stephen would end up. He spoke knowledgeably, professionally, and ambitiously about stock market trends, day trading, and eventually sports betting. Stephen always had a finance background and it seemed like he was ready to be a stockbroker before most high schoolers could explain a stock. His knowledge of the market for the most part went over my head when he talked about it when we were younger, but I knew he was extremely ambitious about "making it" and I too shared ambitious dreams with him, but I never imagined the lengths he would go for profit. I have seen Stephen make some unnecessary sports bets, stuff that didn't make any sense at all to me, but I figured he knew what he was doing. I was wrong and I didn't realize he had an addiction until it was far too late.
>
> He developed a gambling addiction to fill the hole that sports left him. He began compulsive gambling, and borrowing money, and his addiction turned into greed and he made some poor decisions that hurt the closest people around him. Despite the many losses they take, gambling addicts feel like they are just one big win away from the life of their dreams. (Exhibit G)

Patrick Falco has been Stephen's friend since they were eight years old and attended elementary school and high school together. Mr. Falco describes Stephen as "loyal, compassionate, and hardworking. . . offering a helping hand whenever needed." (Exhibit H)  Patrick also witnessed

Stephen's difficult times, beginning in high school, which led to Stephen's depression and he believes

his arrest in this case:

> However, I am aware of Stephen's recent legal troubles, but I do not believe that they truly define who he is. Since graduating from high school, Stephen has run into a string of bad luck. These hard times have led Stephen into a depression. This depression has unfortunately led him down t**h**e path he finds himself on today.
> Stephen's depression led him to develop a gambling addiction, and I believe this addiction is the driving force of his actions. This addiction blinded Stephen to the consequences of his actions, allowing him only to see what can be gained. This gambling addiction was widespread, from gambling on stocks to gambling on sports. During the COVID pandemic, Stephen had told me he was betting on virtual, simulated football games when the seasons were canceled due to the pandemic.
> Addiction is a disease and it has clearly taken its toll on my friend. While Stephen will always remain my friend, I am deeply saddened by his actions. Stephen was always joyous and full of life and his depression and addiction have turned him into a shell of his former self. (Exhibit H)

Ken Kapler is currently a Vice Division Commander in the US Coast Guard Auxiliary at

Station Manasquan in Pt. Pleasant, NJ. His spouse, Judy, is an Executive Secretary to a New Jersey

Superior Court Judge in Monmouth County, NJ. The Kaplers have known Stephen and his family for

over 25 years and consider Stephen to be like their own son. Like so many others who knew Stephen

well, the Kaplers were destroyed when they learned of his arrest. His misconduct was thoroughly

inconsistent with honest young man they have known so well for so long and now realize the impact

that Stephen's gambling addiction had on the choices he made. Mr. Kapler writes:

> Mr. Kapler writes:
> Needless to say, we were devastated when we heard of Stephen's troubles. We were in complete disbelief and couldn't reconcile how he allowed himself to put his family and himself in such a difficult situation. Stephen has always done the right things for everyone around him. He's always put others before himself and was always the first to volunteer to help others in need. His honesty, integrity and ethics have always been above reproach and he's always been "one of the good guys."
> I'm also aware that Stephen has had an addiction to gambling and is getting the help he needs to deal with it. While it's not an excuse for his behavior, I understand that it contributed to his lack of awareness as to his actions. Stephen is also acutely aware of the need to continue with the program he's actively participating in.
> I know Stephen has complete and total remorse for what he did. (Exhibit I)

Frank Mangieri has been friends with Stephen since kindergarten. Mr. Mangieri also observed

21

Stephen's decline into a "self-destructive cycle of gambling addiction" and deep depression:

> Throughout the years, Stephen has consistently demonstrated loyalty, kindness, and care towards both his family and friends . . . there has been a noticeable change in him since high school. He has been grappling with evident depression, likely stemming from familial issues and a strong desire to earn his parents' approval. Regrettably, Steve became ensnared in a self-destructive cycle of gambling addiction as he pursued success and validation. His relentless pursuit of financial gain, particularly in hopes of gaining his father's approval, led him deeper into this harmful addiction. Moreover, the recent revelation of his father's Parkinson's Disease has only compounded his struggles. As someone who has witnessed Steve's journey firsthand, I cannot adequately express my sadness and concern. Over the years, I have observed him increasingly consumed by these challenges. While Steve remains an exceptional individual, his battle with gambling addiction and deep depression has undoubtedly altered him. My friend's demeanor as of late reflects more of a profound sense of being lost and emotionally distressed than that of someone harboring malicious intentions. (Exhibit J)

Nicholas Sigismondi  attended Christian Brother's Academy with Stephen. In his letter to

the Court, Mr. Sigismondi writes that Stephen is "somebody that gets genuinely excited when

he's able to provide support or assistance to a friend." However, Nicholas also recalls when

Stephen's interest in the stock market morphed into a gambling problem and laments his failure

to intervene on his behalf:

> I can remember Stephen being intrigued with the stock market as far back as high school. He would track the market and certain stocks, despite having no money invested at the time. Like anyone else, he loved when he was right and often made an excuse when he was wrong. Looking back on it, it was an early and bright warning sign of a gambling addict. No money involved, but just addicted to the thrill of it.

> Stephen began betting on sports in college. . .  I finally realized he had an issue in the summer of 2020. The world was shut down due to Covid-19, and all major sports were on pause indefinitely. Stephen was back home in New Jersey and invited a few of us over to hangout in his backyard. When I arrived, he was watching a Madden simulation game that he had placed a wager on. I need to be clear that this was a video game, and not even a video game with two humans playing each other, but rather a computer playing itself in a video game, and Stephen was betting on which computer controlled team would win the game. I look back on this and I cringe because I saw first-hand a problem a good friend was having and chose not to address it. I chose not to force him to go to GA  I chose not even to have so much as a serious conversation about his well-being.

What upsets me the most is that is exactly what Stephen would have done had the roles been reversed.  Stephen is a friend that would've sat me down and asked the questions everyone else was afraid to ask.  He would've offered to help in any way he could and I know he would've stuck by my side through all of it. (Exhibit K)

Sebastian Balve is a registered Client Service Associate at Morgan Stanley and has known Stephen for 14 years. Sebastian met Stephen in high school and describes him as a "genuine, kind and understanding person." (Exhibit L) Sebastian also witnessed how Stephen's "vices negatively impacted his life after high school. It was evident that Stephen had a sports gambling addiction, and a need for 'getting ahead in life' as quickly as possible. I saw him exercise bad judgement with his money and his decisions, and that saddened me." Id.

Since his arrest, Stephen began to rehabilitate himself knowing that unless he acts, the abyss is not far away.

g.  **Stephen Has Been in Treatment for Six Months and Has Been Progressing in His Recovery. His Continued Treatment Is Imperative to Ultimate Success.**

After Stephen Forlano's arrest in this case, he was strongly encouraged by his parents, and primarily by his father, to confront his gambling addiction.[10]  Like so many struggling with addictions, Stephen was first in denial and then readily agreed to seek help. He first attended Gamblers Anonymous has been receiving therapy for over 6 months, on a weekly basis, from Recovery Church, a Christian based addiction treatment center with a nationwide presence. https://www.recovery.church/locations.

---

[10] Stephen's father (and his father) had gambling issues as well. Stephen's father has been in "remission" for many years.

Stephen's mother describes that while she was devastated by her son's illness and, like so many others who have written to the Court, shocked by his criminal conduct, healing him was the family's priority:[11]

> As a mother, to hear this was heartbreaking. He was severely broken. Reassuring and loving Stephen, we forgave him and affectionately consoled him. The impact this gambling disorder  had on his life was immeasurable. Stephen realized he must get help for his addiction. He began attending weekly sessions at Recovery Church in Tampa. In addition, he started weekly professional counseling for depression, low self esteem, and feelings of unworthiness. (Exhibit F)

Pastor Jeremy Heine[12] of Recovery Church, has been treating Stephen for months. He explains that Stephen had made good strides in his recovery with a long road still ahead:

> [a]dmitt[ed] he has a problem with gambling and recognizing the negative effect it has had on his life. During the past few months, I've seen him show compassion for others, listen well, volunteer, engage in discussions, worship God, pray, write a list of triggers, recognize the need to be sober, and truly be a man looking to better himself. This includes talking about the remorse he has for the crimes committed and using it in recovery to become a better version of himself. It's my belief that if he continues to work on his recovery and relationship with God, Stephen will one day help others with their addictions. He has a heart for people, and he wants people to be filled with happiness and joy. When others around him are feeling down, anxious, stressed, or out of sorts in any way, I've seen him be compassionate and caring for anyone in these situations. . . We are grateful to have him as part of our community to be part of his journey. (Exhibit M)

Dr. Celene Heine recommends that Stephen's best chance of success is to continue with addiction therapy for at least two years in conjunction with his other charitable endeavors. (Exhibit A).

### 3.  Stephen is a Giving, Charitable and Kind Person Who Is Utterly Devastated By His Serious Lapse in Judgment.

---

[11] The respect in which Stephen was held is evident by the disbelief that his friends experienced on learning of his arrest. See *Zecevic v. United States Parole Com'n*, 163 F.3d 731, 735 (2d Cir. 1998)(noting that "letters from [supporters] expressing shock at the defendant's behavior" are a relevant datum for a sentencing judge).
[12] Pastor Heine is married to Dr. Celena Heine.

Stephen Forlano was essentially a high functioning pathological gambler, who hid his sickness from his family, friends, and business associates. As their letters to the Court attest, they saw a different person from the one engaged in insider trading and are unequivocal in describing Stephen as kind, honest, loving, responsible and charitable.

Since his arrest, and continuing to the present, Stephen has been involved with Feeding Tampa Bay, which is part of the national Feeding America network. The volunteers to the organization are, according to Emily Stewart, the Volunteer Engagement Coordinator, the "lifeblood of our success."  Ms. Stewart writes that as of April 16, 2024, Stephen contributed 46 hours of community service" feeding the hungry of Tamp Bay. (Exhibit N)

Stephen has always been community minded. Denise Forlano writes that at the age of just five, Stephen and his sister, Jaclene, helped raise money for the victims of the 9/11 attack. His altruism continued as he got older. Ms. Forlano describes that for over 7 years Stephen volunteered with Calvary Chapel at the Broken Loaves facility each Sunday bagging donated groceries and hanging clothes for the needy. (Exhibit F)  Recently, Stephen has again become involved with the Clavary Chapel. Joe Harris, senior pastor of Calvary Chapel South Tampa writes that Stephen has "become very involved in our church. When he first started coming to the church, he explained to me some of his personal struggles and that he wanted to grow in his relationship with God. One thing I have noticed about him is how much he has grown in his character as a person. He is always helping where he can and serves in several ways to help our community. I  have noticed how much he cares for others and the connections he has made with other men who challenge him to be a better person." (Exhibit O)

Denise Forlano describes that during "SuperStorm Sandy, Stephen collected coats, clothing, and food to donate to those who had lost everything during the storm. He gathered many items for

the Broken Loaves ministry, where he distributed them to dozens of families who came there seeking help. He would always come home after these events, telling us how gratifying it feels to have the ability to lend a helping hand to those less fortunate than himself. You could clearly see he always felt blessed by his efforts." (Ex. F)

We urge this honorable Court to consider Stephen's charitable work as a factor in determining a just sentence. *See United States v. Rita*, 551 U.S. 338 (Stephens, J., concurring) ("Matters such as . . . charitable, or public service are … matters that § 3553(a) authorizes the sentencing judge to consider."); *United States v. Fred E. Cooper,* 394 F.3d 172, 176-78 (3d. Cir. 2005) (where defendant pleaded guilty to securities fraud and tax fraud, downward departure from 15-21 months to three years of probation based upon "good works that were of a personal nature" was warranted.); *United States v. Robinson,* 2014 U.S. Dist. LEXIS 48944; 2014 WL 1400197 (Dist. of N.J. April 9, 2014), three brothers were convicted by plea of failing to file individual tax returns from 2005-2008. The defendants also used check cashing services to deliberately conceal over $1.5 million in income from the U.S. Treasury. The district court granted the defendants a variance from 18-24 months incarceration to three years of probation, 400 hours of community service and three months of home confinement based on their charitable work and strong family values and family support. *Id.* at **2-3; 9; 17.

### 4. <u>Stephen's Conduct Was Aberrant</u>

As the following letters in support show, Stephen Forlano' misconduct in this case was aberrant and not representative of his true nature. At heart, Stephen is a kind, decent, generous, and caring person dedicated to his family and to his community and amply deserving of a second chance. *See Gupta*, *supra,* 904 F. Supp. 2d at 354 ("the defendant's commission of the instant offenses was aberrant behavior—not aberrant as defined by the U.S. Sentencing Guidelines, but rather as defined

by Merriam–Webster: '. . . atypical,'" and "find[ing] that the aberrant nature of [the defendant]'s conduct by itself would warrant a non-guideline sentence, even aside from the other factors favoring leniency.")

Stephen's aunt, Vivienne Forlano, describes Stephen as a "hardworking and caring nephew" who has shown great care for his cousin who was born with Down Syndrome:

> Throughout the years, I have seen his kindness and generosity. Specifically with his cousin, my son Anthony, who has Down Syndrome. I've seen him teach, engage, and encourage Anthony first hand. Compassion is one of the greatest gifts that we can share with one another and I've watched Stephen work with Anthony over the years. As an older cousin, he has shown Anthony respect by just listening to him express his needs and wants. As a mother of a child with special needs, I observe how people interact with Anthony because it tells me a lot about a person. My son feels very loved by Stephen. (Exhibit P)

Jermin Munoz is a health care provider working in the area of behavioral health and psychiatric care. He has known Stephen for 3 years. Mr. Munoz writes that Stephen is a "genuine guy with no malicious bones in his body and in today's age that's a tough find in a friend."  In his conversations with Stephen about this case, Mr. Munoz has "personally seen the toll my friend's mistake has taken on him, the regret and remorse he's expressed to me so many times." (Exhibit Q)

Sebastiano Borriello is a retired executive at Johnson & Johnson. He has known Stephen Forlano, Sr. for 55 years and Stephen since he was born. Mr. Borriello describes Stephen's "unwavering commitment to integrity and fair play." (Exhibit R)  Stephen has expressed his deep remorse to Mr. Borriello for actions and the impact it has had on his father's health:

> Additionally, I must bring to your attention a recent development in Stephen's life. One of his parents has been diagnosed with Parkinson's disease, and this news has deeply impacted him. He is acutely aware of the challenges that lie ahead as the disease progresses, and he understands the increasing need for mental and physical support for his parents. This realization weighs heavily on him, as he grapples with the desire to fulfill his obligations to society while also longing to be there for his family during this challenging time.
>
> While I too am disappointed on how his gambling impacted his judgement,  I want to

27

emphasize Stephen's genuine remorse for his actions. He has acknowledged to me the need to pay his debt to society, but he also looks forward to the day when he can play his part in caring for his parent(s) and getting back on track in contributing to society in a meaningful way.

David Galloway knows Stephen from church. He writes that Stephen "has demonstrated a deep commitment to his faith and has consistently shown compassion and empathy towards others. Stephen has been involved in various fellowships and has always been willing to lend a helping hand to those in need. . . I firmly believe that this isolated incident does not define his character. From my interactions with Stephen, I have witnessed firsthand his genuine remorse for his actions. He has expressed a sincere desire to take responsibility for his mistakes and to make amends to those affected by his actions." (Exhibit S)

Hank Grassi is a retired NYC Firefighter for 30 years and has known Stephen for 25 years. Mr. Grassi was also Stephen's tennis coach and recalls that Stephen was always been "humble and very sensitive" but "suffered from very low self-esteem and confidence."  He describes Stephen as a "truly  . . . fine and decent young man . . . " (Exhibit T)

Joseph Petro is a retired financial services executive employed as the Chief Operating Officer for Morningstar Credit Ratings; an SEC registered Nationally Recognized Statistical Ratings Organization. Mr. Petro continues to be a mentor for several young financial professionals who were under his management at Morningstar and is a part time instructor at the local school. Mr. Petro has known Stephen since Stephen was just 8 years old when he joined a competitive tournament level baseball team Mr. Petro coached. Over the years, their relationship has grown from one of coach/player to a close friendship with both Stephen and his family. Mr. Petro writes Stephen "set the example for others to follow - he was honest, kind, compassionate, and incredibly hard working. It didn't take long before he was nominated a team captain by his peers. As coaches, Stephen made

us proud because we recognized that we weren't just trying to create great players – we wanted to create great young men." (Exhibit U).

Eric Winters is a retired Fire Captain from the North Hudson Fire and Rescue Department in Hudson County, NJ. He has known Stephen Forlano for over 15 years when his son began playing ice hockey with Stephen. He describes Stephen as "kind, encouraging and supportive." (Exhibit V)

Chase Eslin met Stephen in 2015 as freshman at the University of Tampa and have remained very close friends. Chase writes that Stephen's "passion for helping others never went unnoticed." Chase recounts that after his mother suffered an unexpected brain aneurysm the day after he graduated with his masters degree, Stephen provided his apartment to Chase's family for a month since they could not afford an apartment while his mom was in the ICU. "Anything we needed, he made sure we had." (Ex. W)

In determining the appropriate sentence to impose, we ask Your Honor to consider all of Stephen's positive attributes and respectfully urge that his personal characteristics and history, including his strong family values and charitable endeavor strongly favor a variance to a non-incarceration sentence.

5. **Acceptance Of Responsibility**

Mr. Forlano's decision to plead guilty qualifies for the Acceptance of Responsibility adjustment under U.S.S.G. § 3E1.1. Pursuant to the plea agreement in this case, he pleaded guilty without even filing legal motions saving the government significant time and resources. Although not expressly considered in the adjustment, Mr. Forlano will also reach an agreement with the U.S. Securities and Exchange Commission ("SEC") for a judgment to be entered in the SEC's parallel civil enforcement case against him, presently stayed on consent of the parties. *See USA v. Viggiano,*

1:23-cv-08542-MKV Document 31 Filed 10/30/23.

### 6. The Order of Adjustments in the Guidelines Calculation

Next, regarding the recent "Zero Point Offender" Guidelines Amendment, the parties agree that the Acceptance of Responsibility (U.S.S.G. § 3E1.1) adjustment should be deducted from the Offense Level before the Zero Point Offender (U.S.S.G. § 4C1.1) reduction.  This results in the 2-point Acceptance of Responsibility deduction in the Guidelines calculation here.

Under U.S.S.G. § 1B1.1, the Guidelines calculations are made in order by chapter.  In calculating the Offense Level, the Offense Level is 18.  The Acceptance of Responsibility provision (U.S.S.G. § 3E1.1) then specifies that a defendant is eligible for the full 3-point reduction.  U.S.S.G. § 3E1.1(a).  His Offense Level is then further reduced by 2 points by the Zero-Point Offender adjustment.  *See* U.S.S.G. § 4C1.1 ("If the defendant meets all of the following criteria … decrease the offense level determined under Chapters Two and Three by 2 levels.").  This results in a final Offense Level of 13.

### 7. Guidelines Presumption that a Sentence that Does Not Include a Term of Imprisonment is Appropriate.

Finally, an Offense Level of 13 places Mr. Forlano within Zone C of the Sentencing Table under U.S.S.G. § 5A.  Although the Guidelines have long given courts options with respect to sentencing Zone C defendants, the recent 2023 Amendments added a new provision for "Zero-Point Offenders" like Mr. Forlano: there is a general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first time offender who has not been convicted of a crime of violence or an otherwise serious offense." Commentary to U.S.S.G. § 5C1.1. Certainly, insider trading is not a crime of violence (See USSG §4B1.2(a) defining the term). Regarding the second criterion, the Commission has not defined the term "serious offense." Since one can correctly argue

that all crimes are to some degree "serious," by its language, the Commission must have intended to distinguish between serious and less serious offenses. Insider trading falls into the latter category. Unlike most fraud offenses, for example, insider trading does not involve a "victim." That is, there is no theft of money or property from someone by false or misleading statements; the elderly or less sophisticated are not taken advantage of; there is no manipulation of a security through a pump and dump scheme; all of which directly cause or are intended to cause financial harm to another person or entity. Our position is <u>not</u> intended to diminish the need to punish insider trading, but merely repeats the uncontroversial proposition that no "victim" is harmed in the offense, and that  the insider trading crime is focused primarily on the public's perception that the market is not fair. Arthur Levitt, A Question of Integrity: Promoting Investor Confidence by Fighting Insider Trading, in Vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1, 1998) ("The American people see it, bluntly, as a form of cheating.") Accordingly, while insider trading is certainly not unserious, it is not "serious" within the provisions § 5C1.1and thus weighs in favor of a non-prison sentence.

### 8.  The Purpose of Sentencing

The Sentencing Guidelines direct that each sentence should be determined based on the relevant facts and circumstances and designed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  As the Supreme Court has noted, "these four considerations—retribution, deterrence, incapacitation, and rehabilitation— are the four purposes of sentencing generally, and a court must fashion a sentence 'to achieve the[se] purposes … to the extent they are applicable' in a given case.'" *Tapia v. United States*, 564 U.S. 319,

324 (2011) (quoting 18 U.S.C. § 3551(a)).  Mr. Forlano respectfully submits that a sentence of time

served best fits these purposes, especially accounting for the consequences his actions have already

caused him to date, his extremely low risk of recidivism, the deterrence caused by the media coverage

of his case, and the relative importance of rehabilitation in these circumstances.

**Mr. Forlano Has Already Been Significantly Punished and**
**Does Not Pose a Risk of Recidivism.**

     Initially, Mr. Forlano has already been significantly punished.  His behavior has caused his

father, who is suffering from advanced Parkinson's and will be undergoing brain surgery, to suffer.

That Stephen may not be able to see or help his dad has caused him indescribable agony.  Second, as

explained above, the national humiliation his arrest has caused and the financial and employment

factors that now flow from his conduct have been overwhelming. Under 18 U.S.C. § 3553(a)(2),

there is no doubt that these consequences sufficiently "provide just punishment" for the offense and

"protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(A), (C). Suffice it

to say, Mr. Forlano has learned his lesson and poses essentially no risk of recidivism whatsoever,

particularly since he is seeking help with his gambling addiction. In addition to his specific personal

circumstances, empirical data confirms that true "first offenders" like Mr. Forlano, with no prior

convictions or arrests, exhibit an "extremely low recidivism rate." "Recidivism and the 'First

Offender,'" U.S. Sentencing Guidelines (May 2004) at 17, *available at*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2004/200405_Recidivism_First_Offender.pdf (reporting a 6.8% recidivism rate for true

first time offenders).

     The U.S. Sentencing Commission, in fact, cited similar recidivism data as an important

factor driving the recent Guidelines Amendments for first-time offenders with no criminal history:

"[r]ecidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." 88 Fed. Reg. 28254, 28273 (May 3, 2023)

## General and Specific Deterrence Are Achieved with a Sentence of Non-Incarceration

Congress has instructed that in fashioning an appropriate sentence the Court should consider under §3553(a) whether a sentence will sufficiently deter the defendant and members of the public at large from committing similar offenses. Section 3553(a)(2)(B) "calls upon the Court to take account of some of the broad general purposes of sentencing, specifically, "the need for the sentence imposed . . . (B) to afford adequate deterrence to criminal conduct." *Adelson*, 441 F. Supp. 2d at 514 (quoting 18 U.S.C. § 3553(a)(2)(B)). Section 3553(a)(2)(C) requires that a sentencing court consider "the need for the sentence imposed . . . to protect the public from further crimes of the defendant." *United States v. Pizzino*, 419 F. App'x 579, 583-84 (6th Cir. 2011) (sentence vacated where court failed to address defendant's low risk of recidivism and extensive rehabilitation); *United States v. Pritchard*, 392 F. App'x 433, 437-42 (6th Cir. 2010) (sentence vacated due to court's failure to address defense psychologist's report that defendant had a low risk of recidivism); *United States v. Thomas*, 498 F.3d 336, 339-41 (6th Cir. 2007) (sentence vacated where court failed to consider low rate of recidivism; Court's statement that it read the sentencing report was insufficient). A non-prison sentence would achieve both of these general and specific deterrence goals.

As an initial matter, since Stephen's conduct was impacted by his gambling addiction, his continued treatment makes it highly unlikely he will reoffend. Dr. Heine concluded in her report that:

> In my professional opinion, this diminished capacity related to his gambling disorder was the principal reason he engaged in these unlawful activities, as it left him with significant impairments in controlling his behavior that he otherwise knew was wrongful. Given that he is now in recovery, he should show significantly improved

33

decision-making and impulse control, as he did prior to his gambling disorder. In other words, he is highly unlikely to reoffend. Id. pp. 27-28.

Second, the potential negative impact on Stephen's business career, coupled with the emotional damage that his offenses have inflicted on his close-knit family, has provided enormous specific deterrence. Even more importantly, he will never do anything to hurt or betray his family and friends who have stood behind him. A term of imprisonment under the facts of this case is thus unnecessary to achieve specific deterrence or the overarching dictates of the parsimony clause. *See also United States v. Wunder*, 2010 WL 654754, at *3, 2010 U.S. Dist. LEXIS 16096 (D. Kan. Feb. 23, 2010) ("This was defendant's first criminal offense. He has no prior arrests. His chance of recidivism is less than some other persons who may also have a criminal history category of I"); *United States v. Oldani*, 2009 WL 1770116, at *5, 2009 U.S. Dist. LEXIS 50538 (S.D. W.Va. June 16, 2009) (observing that "[b]ased on empirical research, the commission found that a defendant with no prior arrests or criminal history has … the lowest rate of recidivism of any group in the study").

The Sentencing Commission has also clarified that "[t]here is no apparent relationship between the sentencing guidelines final offense level and recidivism risk . . . the guideline offense level is not designed to predict recidivism, while the criminal history computation is designed to predict [it.]" *Id.* p.13. As a true first time offender with no prior contact with the criminal justice system, Mr. Forlano, like the defendants in *Oldani* and *Wunder*, is not a danger to society and would not risk public safety. Indeed, rather than warehousing Stephen in prison, society would be *much better off with* him performing community service.[13]

---

[13] A recent meta-analysis of 166 studies concluded that "custodial sentences have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation." Damon M. Petrich et. al., *Custodial Sanctions and Reoffending, A Meta-Analytic Review,* 50 CRIME & JUSTICE 353, 401 (2021).

Mr. Forlano submits that his arrest and guilty plea have already achieved a significant deterrent effect. Indeed, general deterrence to criminal conduct is increased when a defendant's criminal proceedings are, as here, well-publicized. *See, e.g., United States v. Frazier*, 2013 WL 499245, at *5 (D.N.M. Feb. 4, 2013) (noting the Government's view that the defendant's guilty plea and the accompanying "publicity and public support for justice" had "already served the factor of general deterrence"); *United States v. Hoffmann*, 2006 WL 3390736, at *6 (D. Neb. Nov. 22, 2006) ("[Defendant]'s prosecution received considerable publicity in his hometown. That publicity, along with damage to [defendant]'s reputation, will also deter others from engaging in similar criminal conduct. The mere fact of the prosecution of these individuals sends a compelling message of deterrence."), *aff'd*, 556 F.3d 871 (8th Cir. 2009).

The prosecution's argument (Govt. Sent. Memo, at p.5) that incarceration is necessary to deter others because of the difficulty in ferreting out and detecting insider trading crimes is overstated and no longer particularly valid. Recently, the SEC's use of algorithms and other advanced analytical techniques has made the detection and investigation of insider trading cases much easier. Indeed, an entire section, known as the Market Abuse Unit, has been set up by the SEC just to detect unusual trading activity. https://www.reuters.com/article/idUSKBN19L27J/. Not surprisingly, the SEC recently boasted that "no trading scheme is beyond [its] ability to unwind." See Press Release, Sec. & Exch. Comm'n, SEC Charges 32 Defendants in Scheme to Trade on Hacked News Releases (August 11, 2015) https://www.sec.gov/news/press-release/2015-163. Accordingly, the  argument that difficulties in detecting insider trading warrant harsh sentences to promote the objective of general deterrence in overstated in light of the government's current surveillance and analytical capabilities. See **The Declining Need for General Deterrence in Insider Trading Sentencing,** *David Oliwenstein1 and John Van Son,* Published by the American Bar Association Criminal Justice

Section. White Collar Crime committee newsletter, Summer/Fall 2023; https://www.americanbar.org/content/dam/aba/publications/criminaljustice/2023/insider-trading.pdf

Accordingly, Mr. Forlano respectfully submits that imposition of a period of incarceration is not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).

**The Need to Avoid Unwarranted Disparities Among Similar Offenders**

"[T]he need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), weighs in favor of imposing a noncustodial sentence on Mr. Forlano. A prison sentence would be harsher than the more lenient sentences that other district courts have imposed on similarly situated persons convicted of trading on material, non-public information whose conduct resulted in similar or even higher profits.

To start, a custodial sentence would be inconsistent with the probationary sentences other courts have imposed, for example, on attorneys who traded on clients' material, non-public information in similar (or even greater) dollar amounts. In *United States v. Schulman*, for example, the defendant, Robert Schulman, was a partner in the Washington, D.C. office of a national law firm. *See United States v. Schulman*, No. 16-cr-442 (E.D.N.Y.). Schulman was accused of informing his investment adviser that his client, King Pharmaceuticals, planned to merge with Pfizer. *See* Indictment at 3–4, *Schulman* (E.D.N.Y. Aug. 4, 2016), ECF No. 1. The Government alleged that the adviser then traded King securities in his own accounts and on behalf of Schulman and other clients and tipped off another adviser. *See id.* at 4–6. Ultimately, the tip Mr. Schulman provided to his investment adviser resulted in $319,000 in illicit profits, including $15,500 in profits for Mr. Schulman himself. *See id.* at 6. Unlike Mr. Forlano, Mr. Schulman elected to go to trial, where he was convicted of conspiracy and securities fraud. Notwithstanding the government's request for a

prison term ranging from 51 to 64 months, *see* Sentencing Memorandum at 5, 14, *Schulman* (E.D.N.Y. Sept. 18, 2017), ECF No. 145, the district court sentenced Schulman to three years of probation, *see* Judgment at 2, *Schulman* (E.D.N.Y. Oct. 4, 2017), ECF No. 153.

As another example, a district court in New Jersey sentenced Gene Levoff, an attorney who previously served as Apple's global head of corporate law and corporate secretary, to probation for a more egregious and profitable insider trading scheme. *See United States v. Levoff*, No. 19-cr-780 (D.N.J.). Levoff was on a committee of senior executives who reviewed Apple's draft earnings materials prior to their public dissemination each quarter. *See* Indictment at 2, *Levoff*, (D.N.J. Oct. 24, 2019), ECF No. 16. Using the confidential information he learned from his review of those materials, Levoff traded Apple securities ahead of three quarterly earnings announcements in 2015 and 2016 and made approximately $382,000 in combined profits and losses avoided. *See id.* at 7. Exacerbating Levoff's conduct was the fact that, in his role, he was responsible for securities laws compliance at Apple, including compliance with insider trading laws. *See id.* at 2. As part of his duties, Levoff reviewed and approved the company's insider trading policy and notified employees of their obligations under it regarding quarterly earnings announcements. *See id.* After unsuccessfully moving to dismiss the indictment, Levoff ultimately pled guilty and was sentenced to four years of probation. *See* Judgment at 4, *Levoff*, (D.N.J. Dec. 11, 2023), ECF No. 38. Not only were Levoff's illicit profits greater than Mr. Forlano's, but Levoff's unique role overseeing a Fortune 5 company's securities law compliance enhanced his culpability in a way that Mr. Forlano's conduct does not.

As a final attorney example, the former general counsel of SeaWorld Entertainment, Inc., Paul Powers, was sentenced to five years of probation following his guilty plea to insider trading. *See* Judgment at 2, *United States v. Powers*, No. 19-cr-57 (M.D. Fla.), ECF No. 27. Powers had early access to key revenue information as the company's associate general counsel and assistant secretary,

and he purchased 18,000 shares of SeaWorld stock the day after he received a confidential draft of the 2018 second quarter earnings release that detailed a strong financial performance by the company after a lengthy period of decline. *See* Indictment at 5–8, *Powers*, ECF No. 1. Powers immediately sold his SeaWorld shares for approximately $65,000 in illicit profits (over $79,000 adjusted for inflation) after the company announced its positive earnings and the company's stock price increased by 17 percent. *See id.* at 7–8.

And these are hardly the only insider trading defendants to have received noncustodial sentences in cases similar to or objectively more serious than here:

| Case | Description | Loss Amount | Sentence |
|---|---|---|---|
| *United States v. Collins*, No. 18-cr-567 (S.D.N.Y.) | Defendant's father, a U.S. Congressperson, learned that a clinical trial involving a product being developed by an Australian biotech company had gone poorly. Defendant's father passed that information to defendant, who sold the company's shares before the clinical trial information became public. Defendant also passed the information to his fiancé's father. | $570,900 | Five years of probation (Guidelines range was 37-46 months); $150,000 fine; $100 assessment. |
| *United States v. Anderson*, No. 06-cr-91 (N.D. Ga.) | Defendant, a vice president of a regional bank, learned that the bank's owner was to be acquired by a large, multinational bank. Defendant traded in the owner's stock, and passed on the information to a friend, who also traded in the stock. | $134,999 | Three years of probation (Guidelines range was 18-24 months, and Government sought 18 months imprisonment); $100 assessment. |

38

| | | | |
|---|---|---|---|
| *United States v. Catenacci,* No. 21-cr- 759 (N.D. Ill.) | Defendant consulted on a drug trial for a cancer drug, and before the trial's results were publicized, purchased the drug developer's stock. After the trial results were published, defendant sold the stock. | $134,142 | Time served (one day) and one year of supervised release (Guidelines range was 15-21 months, and Government sought 12 months imprisonment); $200,000 fine. |
| *United States v. Ettu*, No. 18-cr-490 (E.D. Pa.) | Over a two-year period, Defendant bought short and long positions based on material, non-public information obtained from an associate at a global investment bank. | $93,244 | Three years of probation (Guidelines range was 10-16 months); forfeiture of illicit gains; $15,000 fine; $100 assessment. |
| *United States v. Kaplan,* No. 23-cr-320 (GHW) | The Defendant, a physician, purchased option based on a tip and tipped family members and friends. | $472,000 in personal profit and $1.7 million in foreseeable gains to tippees. | 5 months of prison (variance from 30-37 months); forfeiture of gains; $100 assessment. |
| | | | |

In these cases—which with only one exception-- featured higher loss amounts than Mr. Forlano's trading produced—courts declined to sentence defendants convicted of insider trading to custodial sentences, opting instead for probation or time served. Accordingly, sentencing Mr. Forlano to prison would create an unwarranted disparity with these defendants.[14]

**VIII**. **PSR RECOMMENDATION**

As part of its sentencing recommendation, the PSR suggested a sentence of 6 months incarceration and two years of probation; and that a $5500 fine be imposed. First, it is significant that the PSR's 6 month prison recommendation was made despite the erroneous belief that no variance

---

[14] Indeed, even prior to the enactment of the zero point offender amendment, almost one-third of defendants in Stephen's range received non-prison sentences. PSR Appendix A, p. 25

was legally permitted for a gambling addiction. PSR p. 30 ("The basis (the addiction or disorder) for such criminal conduct cannot be used as a factor for a departure or a variance.") Since a variance for pathological gambling is judicially recognized as a basis for a variance, we believe the PSR's variance recommendation may have been greater had it correctly been considered. Second, under the facts of this case, no fine is warranted. The defendant will forfeit over $115,000 to the government and may have an additional disgorgement requirement to the SEC. He is presently working for DoorDash delivering food and will have a debt to his parents for the enormous financial obligation this case has caused. We ask that he not be saddled with a fine.

## <u>CONCLUSION</u>

### <u>CONSIDERATION OF THE 3553(a) FACTORS FAVORS A NON- PRISON SENTENCE AS FAIR AND JUST UNDER THE PARSIMONY CLAUSE.</u>

As stated earlier, "sentencing is the most sensitive, and difficult, task that any judge is called upon to undertake." *United States v. Adelson,* 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006). Stephen Forlano's case proves the point. This is not a case in which a sentence should be based principally on the amount of money that Stephen and his tippees made, as the Sentencing Guidelines would have it. Id. at 509 ("the Sentencing Guidelines . . . in an effort to appear 'objective' tend to place great weight on putatively measurable quantities . . . without, however, explaining why it is appropriate to accord such huge weight to such factors"). Unlike most fraud cases, greed played a small role here. There was no high living or lavish purchases. Stephen lost all of the money he saw from his crime.

As noted above, virtually all of those who have written letters report that they were shocked when they learned that Stephen had been arrested. That is not simply because he hid his gambling from others but because others knew him as a person of integrity and honesty. Their words are powerful indicators of the good that Stephen has done and will do in the future. See *United States v.*

*Gupta*, 904 F. Supp. 2d 349, 354 (2012)("a court [must] take account of a defendant's character in imposing sentence, . . . for on this day of judgment, must not one judge the man as a whole?").

We recognize that Stephen's crime must be punished. There has already been meaningful punishment. He has suffered the stigma of a felony conviction and the loss of the ability to work in the financial service industry, where he was working. See *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009)("the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant"). Whatever property he has will be forfeited. Perhaps most importantly, Stephen has taken giant strides to conquer his demons. He is committed to treatment and sobriety and to rebuilding his relationship and trust with his family and with himself. A prison sentence could derail him. See *United States v. Hawkins*, 380 F. Supp. 2d 143, 165 (E.D.N.Y. 2005)("[r]ehabilitation should not now be destroyed by . . . unthinking application of mechanical rules for imprisonment"). If ever compassion and mercy were called for in sentencing a defendant, this is such a case. Consistent with the recommendation of Dr. Heine, we request that Your Honor impose a probationary sentence with a special condition of on-going therapeutic care.[15]

---

[15] The Forlano family (with Stephen's consent) reached out to George Yagojinski, the Director of Uturn for Christ Florida, to render addiction treatment in a structured setting. Mr. Yagojinski's letter is attached here. (Ex. X)

We submit that consideration of the facts in light of the §3553(a) factors strongly militate in favor of a non-prison sentence.


Dated:   New York, NY
          April  30, 2024

                                        Respectfully submitted,
                                        **BACHNER &  ASSOCIATES, P.C.**


                                        By:  /s/ *Michael F. Bachner*
                                        Michael F. Bachner MB-7719
                                        111 Broadway, Suite 701
                                        New York, NY 10006
                                        T: (212) 344-7778
                                        F: (212) 344-7774
                                        mb@bhlawfirm.com